IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | Civil Action No. _____ |
| v. | ) | |
| | ) | JURY DEMAND |
| CITY OF VENICE, FLORIDA, | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, the United States of America ("Plaintiff" or "United States"), by the undersigned attorneys, alleges as follows:

1. This civil action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII").

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action under 42 U.S.C. § 2000e-5(f) and 28 U.S.C. §§ 1331, 1343(a), and 1345.

3. Venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b) because it is where a substantial part of the events or omissions giving rise to the cause of action herein occurred.

## PARTIES

4. Plaintiff is expressly authorized to bring this action by Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. §§ 2000e-5(f)(1) and (3).

5.  Defendant City of Venice, Florida ("Defendant" or "City") is a governmental body established pursuant to the laws of Florida and is located within this judicial district.

6.  Defendant is a "person" within the meaning of 42 U.S.C. § 2000e(a) and an employer within the meaning of 42 U.S.C. § 2000e(b).

7.  James Williamson ("Williamson") filed a timely charge with the United States Equal Employment Opportunity Commission ("EEOC") (Charge No. 511-2015-01071) on February 28, 2015, alleging that Defendant discriminated against him in employment based on his race (Black).  Pursuant to Section 706 of Title VII, 42 U.S.C. § 2000e-5, the EEOC investigated the charge, found reasonable cause to believe Williamson was subjected to discrimination on the basis of race, attempted unsuccessfully to achieve resolution of this matter through conciliation, and subsequently referred the charge to the Department of Justice.

8.  All conditions precedent to this lawsuit have been performed or have occurred.

## FACTUAL ALLEGATIONS

*Williamson's Employment in the Parks Division of the City's Public Works Department*

9.  Williamson was first hired by the City in 1987 as a Truck Driver/Laborer in the Parks Division of the City's Public Works Department (PWD).  In 1990, Williamson was promoted to Municipal Service Worker in the Parks Division.  Then, in 2000, Williamson was promoted to Heavy Equipment Operator in the Parks Division, the position he held until his termination in 2016.

10. As a Heavy Equipment Operator, Williamson, like the other Heavy Equipment Operators in the Parks Division, performed numerous landscaping duties that included operating a "bucket" truck to lift him up into trees for cutting limbs and a "claw" truck to pick up and collect branches and other heavy debris.

11. In 2015, the City Government had 269 full time employees, 7 of whom were Black and 255 were White.

12. In 2016, the City's PWD had 47 employees, 3 of whom were Black and 43 were White.

13. During Williamson's tenure in the Parks Division, Williamson was the only Black employed in PWD's Parks Division. All of the other Parks Division workers were White.

14. The Parks Division employed about 11 workers at any one time; three were Heavy Equipment Operators and the rest were lower-paid, lower-ranked workers.

*Racial Hostility at the Public Works Department*

15. In 2015, a racially charged incident occurred involving a noose hung in the PWD workplace. The City identified the PWD worker responsible for putting it there. An internal investigation of the matter was conducted by City Administrative Services Director Alan Bullock ("Bullock"). In his memorandum to the City Manager dated April 23, 2015, reporting the results of his investigation, Bullock concluded "we do not believe [the worker] intended any malice" and that the worker "did not intend to target anyone with any sinister underlying message." The identified worker received only counseling.

16. In 2006, Warren "Skip" Petitt ("Petitt"), who is White, was appointed as Parks Foreman to head the Parks Division. Petitt had previously worked in PWD's Maintenance Division. Petitt was the sole direct supervisor of all of the Parks Division employees.

17. As Parks Foreman, Petitt became Williamson's direct supervisor and remained so through Williamson's termination in 2016.

18. During the period he supervised Williamson, Petitt exhibited anti-Black racial animus in the workplace generally and towards Williamson in particular. For instance, Petitt

often used the racial slur "Nigger" in the workplace in referring to Williamson specifically or to Black people generally.

19. In or around 2006, Petitt was asked by a coworker who would handle trash duties for the Parks Division, and Petitt responded, "We'll let the Nigger do it," referring to Williamson.

20. In or around 2010, Petitt told a PWD employee he was angered by Williamson dating or otherwise interacting with White females.

21. During the period Williamson was supervised by Petitt, Williamson and a coworker were involved in a verbal altercation directly outside Petitt's office that ended with the coworker calling Williamson a "Nigger." Williamson immediately went to Petitt and complained about the racial insult. Petitt refused to take any corrective action against the coworker and told Williamson, "You need to get back to work."

22. In or around 2015, Petitt told a PWD employee, "The only reason Williamson is here is because of the color of his skin."

23. In or around 2015, while seeking to discipline Williamson for a purported work violation, Petitt was overheard telling two coworkers, "This time we are going to get rid of Serge [Williamson's nickname]."

24. Williamson was the longest-tenured, highest-ranked worker under Petitt in the Parks Division.

25. According to Williamson and his coworkers, Petitt noticeably treated Williamson far more harshly than his White coworkers in supervising him and in daily interactions. For instance, unlike with White Heavy Equipment Operators, Petitt regularly assigned Williamson to trash pickup and other undesirable tasks inconsistent both with Williamson's Heavy Equipment

4

Operator job title and with the normal practice of assigning trash pickup to the lowest-tenured and lowest-ranked workers in the Parks Division.

26. Unlike with the White Heavy Equipment Operators, Petitt required Williamson to perform extensive landscape tasks by himself that were normally assigned to two- or three-person crews.

27. Unlike with the White Heavy Equipment Operators, Petitt excessively scrutinized Williamson's work to find fault, often following Williamson, taking pictures of his work, and surveilling him during his daily work route.

28. Petitt did not allow Williamson to stop briefly at a convenience store as his White coworkers regularly did, and chastised Williamson even for brief stops in a park for bathroom breaks, lunch, or job-related paperwork.

29. On numerous occasions when Williamson asked Petitt legitimate work-related questions, Petitt dismissively told him, "You should know," and walked away, in stark contrast to his cordial dealings with his White subordinates. Such was Petitt's racial hostility toward Williamson that, when talking with other employees about Williamson, Petitt would not refer to him by name but only as "that one."

30. In November 2012, Charles "Chuck" Speake ("Speake"), who is White, was hired from outside City Government to be PWD's Parks and Maintenance Superintendent. In that job, Speake became Petitt's first-line supervisor and Williamson's second-line supervisor.

31. As Petitt's and Williamson's supervisor, Speake was involved in, approved, supported, or was aware of, the racially discriminatory actions against Williamson herein alleged.

*Disciplinary Actions against Williamson*

32. The City has a progressive disciplinary policy where each discipline for a work violation justifies a harsher discipline for the next violation. The progressive disciplines are, from lowest to highest: oral reprimand, written reprimand, suspension without pay, demotion, and termination.

33. Beginning in July 2014 and following Speake's hiring, Petitt disciplined Williamson at least nine times in two years, including three times in one day.

34. On July 16, 2014, Williamson was given an oral reprimand for alleged sick leave abuse from July 2013 to July 2014 based on an alleged "pattern" of leave usage; that is, Williamson was alleged to have taken sick leave one or two days a month, every month, either before or after the weekends, and to have had minimal sick leave accumulated.

35. With regard to this reprimand for purported sick leave abuse, it was not alleged, much less shown, that Williamson took sick leave on days he was not sick.

36. Also, on July 16, 2014, Williamson was given a written reprimand for not properly calling-in to work during two days of hospitalization (May 13 and 14, 2014), including confinement to the Intensive Care Unit, following a major diabetes attack suffered on the job on May 12 that required his immediate transport to the hospital by a coworker.

37. With regard to this reprimand for not calling-in, (a) Parks Division management was already aware Williamson was in the hospital because a coworker took him directly to the hospital from work and promptly notified Speake about what had happened; (b) neither Petitt nor Speake ever called Williamson during his hospitalization to check on his health or welfare or on his availability for work; and (c) Williamson was not able to call-in to work from the hospital due to his poor health and lack of access to a telephone.

38. Williamson filed an internal grievance of the reprimand that was successful, and, responding to a complaint by Williamson, the U.S. Department of Labor found that the reprimand violated his rights under the Family and Medical Leave Act (FMLA).

39. Again, on July 16, 2014, Williamson was given a written reprimand for allegedly failing to follow proper protocol in closing a traffic lane where his truck was briefly parked to spread mulch over a median strip on June 11, 2014.

40. With regard to this reprimand for purported breach of protocol, earlier the same day, Williamson's supervisors saw him close a traffic lane for work reasons in the exact same way and raised no objection that it was improper. In addition, a coworker closed the traffic lane in the same way, yet was never reprimanded.

41. On September 16, 2014, Williamson was given a 3-day suspension without pay, under the City's progressive discipline policy, for leaving his work area without authorization—specifically taking a work break in a local park—on August 13, 2014.

42. Under the City's progressive discipline policy, the three prior disciplines on July 16, 2014, provided the predicate justification for the 3-day suspension.

43. During Williamson's internal grievance of the 3-day suspension, the then-PWD Director John Veneziano admitted that many PWD workers had taken work breaks in that park for lunch and other personal reasons.

44. On January 7, 2015, Williamson was given counseling by Petitt for talking with Local Union President Daniel Tucci ("Tucci") on October 23, 2014, but, in the employee counseling form signed by Petitt, he stated, "No conclusions are drawn and no one is accused of any wrongdoing."

45. On March 4, 2015, Williamson was given a 5-day suspension without pay under the City's progressive discipline policy, for not picking up trash around the trash cans on September 2, 2014 and January 5, 2015, stemming from his disagreements with Petitt about whether certain items were trash or non-trash (such as slats from broken benches). Other coworkers had handled trash pickup in the same manner as Williamson without reprimand.

46. Under the City's progressive discipline policy, the prior disciplines of Williamson contributed to the 5-day suspension.

47. On April 8, 2015, Williamson was given counseling for socializing with a female pedestrian in a local park on April 2, 2015; the female pedestrian was White.

48. On June 24, 2015, Williamson was given counseling for failing to fully empty recycle bins on May 28, 2015.

49. On June 24, 2015, Williamson was given yet another counseling for socializing with a person in a parked car on June 8, 2015; the person was a White female.

50. With regard to each of the disciplinary actions against Williamson referenced above, during the period from 2006 through 2016, White Heavy Equipment Operators in the Parks Division under Petitt's supervision engaged in the same behaviors for which Williamson was disciplined, yet Petitt never took disciplinary action against any of them.

51. During the period from 2006 through 2016, Petitt never disciplined any White Heavy Equipment Operator in the Parks Division for any work violation of any kind.

52. Williamson's two unpaid suspensions referenced above were progressive disciplines supposedly justified, in part, by the prior three reprimands issued July 16, 2014, but, in Williamson's case, the City departed from City policy in regard to the July 16 disciplinary actions by: (a) failing to impose the reprimands in a timely manner, waiting months in some

instances after the alleged infraction to reprimand him; (b) issuing the three reprimands on the same day even though they were for different alleged violations occurring on different dates; and (c) counting the reprimands on July 16 separately for progressive discipline purposes, which subjected Williamson to harsher discipline for future violations than had they been considered together.

*The City's Failure to Investigate Williamson's Internal Discrimination Complaint*

53. Amid this onslaught of disciplines, on December 19, 2014, Williamson and Local Union President Tucci met with Director Bullock and Assistant City Manager Len Bramble ("Bramble") to complain about Petitt and Speake's racially discriminatory treatment of Williamson, especially singling out Williamson for baseless disciplinary actions. However, in a memo responding to Williamson and Tucci, dated January 12, 2015, Bullock and Bramble stated that they found no evidence of discrimination or harassment.

54. No documented investigation of Williamson's December 2014 internal racial discrimination complaint was ever conducted by the City.

*Termination of Williamson's City Employment in 2016*

55. On November 4, 2015, Williamson was placed on a written Performance Improvement Plan (PIP). Originally set to end January 12, 2016, the PIP was extended to June 27, 2016, after part of Williamson's foot was burned off in a workplace accident.

56. According to its text, the PIP was based mainly on the prior series of discriminatory disciplines alleged herein and on a negative performance evaluation largely based on those same disciplines.

57. The PIP identified general areas of improvement for Williamson, but failed to set out specific objective requirements Williamson had to satisfy in order to successfully complete

9

the PIP. This left the determination of whether Williamson was successful to the subjective judgment of his direct supervisor Petitt.

58. The PIP stated that, if Williamson did not successfully complete it, he could face disciplinary action up to and including termination.

59. While Williamson's PIP was underway, Local Union President Tucci told Director Bullock that he planned to legally challenge the PIP on behalf of Williamson on the ground that it violated Williamson's protections under the FMLA. Bullock responded that Williamson would be fired immediately, before the PIP period ended, if Tucci tried to legally challenge the PIP.

60. In a Notice of Pre-determination Hearing dated August 8, 2016, the City advised Williamson that he was being terminated because he had failed the PIP. The Notice asserted no other reason for his termination.

61. The Notice of Pre-determination Hearing asserted, without any factual basis or elaboration, that Williamson had made "insufficient improvement" in the PIP to warrant his continued employment. The Notice did not articulate any clear and specific reason for the determination Williamson failed the PIP.

62. Williamson's employment with the City was terminated, effective August 16, 2016.

63. After Williamson was terminated, he was replaced in his Heavy Equipment Operator's position by a White person (Michael Cararo).

64. From 2006 through 2016, White Heavy Equipment Operators in the Parks Division engaged in the same conduct that supposedly justified Williamson's PIP and

termination, but Williamson was the only Heavy Equipment Operator that Petitt placed on a PIP or terminated for cause.

65. Insofar as Williamson's PIP and termination were based on prior disciplines for alleged violations of work rules, White Heavy Equipment Operators in the Parks Division exhibiting the same behavior from 2006 through 2016 never received any discipline from Petitt.

*Damages Suffered by Williamson*

66. Williamson experienced emotional stress including, but not limited to, anxiety, stress, and humiliation, as result of the discriminatory disciplines and termination based on race.

67. Williamson has also suffered monetary losses as a result of the racial discrimination.

**CLAIMS FOR RELIEF**

**COUNT ONE**
**Title VII, 42 U.S.C. §§ 2000e-2(a)**
**Discriminatory Discipline Based on Race (Placement on Unpaid Suspensions)**

68. The United States repeats and incorporates by reference the factual allegations set forth in paragraphs 9-54, 66-67.

69. Defendant engaged in unlawful employment practices in violation of Title VII when it placed Williamson on a 3-day unpaid suspension in 2014 and a 5-day unpaid suspension in 2015, because of his race.

70. Williamson, the only Black employee in the Parks Division, was subjected to these adverse employment actions for which he lost pay.

71. Defendant treated similarly situated White employees more favorably than Williamson with respect to the workplace infractions allegedly justifying the unpaid suspensions.

72. At the time of these disciplines, Williamson had been a Heavy Equipment Operator in the Parks Division for fifteen years.

73. Defendant's purported reasons for disciplining Williamson with unpaid suspensions are pretext for race discrimination.

74. The effect of the disciplines complained of herein has been to deprive Williamson of equal employment opportunities and otherwise adversely affect his status as an employee because of his race.

75. As a result of Defendant's unlawful discriminatory discipline, Williamson incurred damages including, but not limited to, lost income.

76. As a result of Defendant's unlawful discriminatory disciplines, Williamson suffered emotional harm including, but not limited to, pain and suffering, emotional distress, anxiety, stress, and loss of enjoyment of life.

77. As a result of Defendant's unlawful discrimination, Williamson incurred damages related to out-of-pocket expenses including, but not limited to, health care expenses.

## COUNT TWO
### Title VII, 42 U.S.C. §§ 2000e-2(a)
### Discriminatory Termination Based on Race

78. The United States repeats and incorporates by reference the factual allegations set forth in paragraphs 9-67.

79. Defendant engaged in an unlawful employment practice in violation of Title VII when it terminated Williamson's employment with the City in 2016, because of his race.

80. Williamson, the only Black employee in the Parks Division, was subjected to this adverse employment action for which he lost pay.

81. Defendant treated similarly situated White employees more favorably than Williamson with respect to the workplace infractions and other asserted bases used by Defendant to justify the termination.

82. After terminating Williamson, Defendant replaced him in his Heavy Equipment Operator job with a White employee.

83. At the time of his termination, Williamson had been a Heavy Equipment Operator in the Parks Division for sixteen years.

84. Defendant's purported reasons for terminating Williamson are pretext for race discrimination.

85. The effect of the termination has been to deprive Williamson of equal employment opportunities and otherwise adversely affect his status as an employee because of his race.

86. As a result of Defendant's unlawful discriminatory termination, Williamson incurred damages including, but not limited to, lost income.

87. As a result of Defendant's unlawful discriminatory termination, Williamson suffered emotional harm including, but not limited to, pain and suffering, emotional distress, anxiety, stress, and loss of enjoyment of life.

88. As a result of Defendant's unlawful discriminatory termination, Williamson incurred damages related to out-of-pocket expenses including, but not limited to, health care expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States prays that this Court grant the following relief:

A.	Order Defendant to implement policies, practices, and procedures to prevent race discrimination in the workplace;

B.	Provide make-whole relief to Williamson, including backpay to compensate him for the loss he has suffered as a result of Defendant's discriminatory conduct alleged in this Complaint;

C.	Award Williamson any prejudgment interest on the amount of lost wages and benefits determined to be due;

D.	Award damages to Williamson to fully compensate him for pain and suffering caused by Defendant's discriminatory conduct alleged in this Complaint, pursuant to and within the statutory limitations of Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a; and

E.	Award such additional relief as justice may require, together with the United States' costs and disbursements in this matter.

## JURY DEMAND

The United States hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

Date:  September 15, 2020

Respectfully submitted,

      ERIC S. DREIBAND
      Assistant Attorney General
      Civil Rights Division

BY:	/s/ Louis Whitsett
      DELORA L. KENNEBREW, Chief
      (GA Bar No. 414320)
      CLARE GELLER, Deputy Chief
      (NY Bar No. 4087037)

a
b

c

LOUIS WHITSETT, Senior Trial Attorney
(DC Bar No. 257626)
U.S. Department of Justice
Civil Rights Division
Employment Litigation Section
4 Constitution Square, Room 9.1138
Washington, D.C.  20002
Telephone: (202) 305-0942
Facsimile: (202) 514-1005
Email:  Louis.Whitsett@usdoj.gov

Attorneys for Plaintiff United States of America

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
United States of America

### DEFENDANTS
City of Venice, Florida

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Delora Kennebrew, Clare Geller, Louis Whitsett; U.S. Dept of Justice; Civil Rts. Division (ELS); 4 Const. Sq., Rm. 9.1138; Washington, DC 20002; 202 305 0942

Attorneys *(If Known)*
Cindy Townsend; Bell and Roper, P.A.; 2707 East Jefferson Street; Orlando, FL 32803; 407 897 5150

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

[X] 1 U.S. Government Plaintiff
[ ] 2 U.S. Government Defendant
[ ] 3 Federal Question *(U.S. Government Not a Party)*
[ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**TORTS — PERSONAL INJURY**
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

**TORTS — PERSONAL INJURY**
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [X] 442 Employment
- [ ] 443 Housing/Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS — Habeas Corpus:**
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

**Other:**
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

[X] 1 Original Proceeding
[ ] 2 Removed from State Court
[ ] 3 Remanded from Appellate Court
[ ] 4 Reinstated or Reopened
[ ] 5 Transferred from Another District *(specify)*
[ ] 6 Multidistrict Litigation - Transfer
[ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII of the Civil Rights Act of 1964

Brief description of cause:
Racially discriminatory discipline and termination of black city employee

## VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE: 09/15/2020

SIGNATURE OF ATTORNEY OF RECORD: /s/ Louis Whitsett

**FOR OFFICE USE ONLY**

RECEIPT # ____  AMOUNT ____  APPLYING IFP ____  JUDGE ____  MAG. JUDGE ____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.
  **(b)** **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)
  **(c)** **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.**  (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.** **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: [Nature of Suit Code Descriptions](#).

**V.** **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.